The STATE of Ohio, Appellee,

v.

HARR, Appellant.

[Cite as *State v. Harr*, 158 Ohio App.3d 704, 2004-Ohio-5771.]

Court of Appeals of Ohio,
Second District, Clark County.

No. 2002–CA–105.

Decided Oct. 8, 2004.

---

Daniel P. Driscoll, Assistant Prosecuting Attorney, for appellee.

Brent A. Crane and Anne P. Keeton, for appellant.

BROGAN, Judge.

{¶ 1} Paul Harr appeals from his conviction of gross sexual imposition in the Clark County Common Pleas Court after a jury trial. The victim was a seven-year-old child we will refer to in this opinion as J.N. Harr was originally indicted for two counts of gross sexual imposition and one count of attempted gross sexual imposition. The additional charges of which he was acquitted involved J.N.'s older sister B.N. The charges stemmed from accusations made by B.N. that Harr inappropriately touched her when she was in Harr's apartment on March 20, 2002. While investigating B.N.'s complaint, Sergeant Steven Crabbe of the South Charleston Police Department was informed that a second child was seen leaving Harr's apartment, who Crabbe learned was B.N.'s younger sister, J.N.

{¶ 2} On April 1, 2002, Officer Crabbe spoke with J.N.'s mother, Brenda, about the allegation that J.N. might have been in Harr's apartment and might have been abused by him. Brenda confronted J.N. about being in Harr's apartment, since she had been admonished not to go there. J.N. admitted to her mother that she had gone to Harr's apartment to get candy and that Harr had touched her breasts. Crabbe arrested Harr and charged him with the offenses for which he was later indicted.

{¶ 3} At trial, J.N. took the stand and broke down crying in response to questions by the prosecution. The trial court permitted J.N.'s father to take the stand with her to make her more comfortable, but J.N. was unable to speak without sobbing. The trial court then excused J.N. from testifying. The defense moved for a mistrial, which was denied by the trial court. The state called Brenda to testify about J.N.'s accusation against Harr. The defense objected to Brenda's hearsay testimony, but the trial court overruled the objection.

{¶ 4} "Q. All right. And was it earlier that day that you had talked to Sergeant Crabbe?

{¶ 5} "A. Yes, it was.

{¶ 6} "Q. What questions—what was the first question that you asked your daughters?

{¶ 7} "A. I asked them if they had ever been in his apartment.

{¶ 8} "Q. In whose apartment?

{¶ 9} "A. Paul Harr's apartment.

{¶ 10} "Q. Okay. And at that point in time again without going into statements that they made, did either of your daughters react in any kind of an unusual manner?

{¶ 11} "A. J.N. did.

{¶ 12} "Q. Okay. How did she act at that point?

{¶ 13} "A. Nervous and scared, like she didn't want to talk in front of her sister.

{¶ 14} "Q. All right. Tell the ladies and gentlemen of the jury what you mean—I mean give us some descriptions.

{¶ 15} "A. She just kept on moving her eyes back and forth from her sister to me like she didn't want to say anything in front of her sister. I knew something was wrong.

{¶ 16} "Q. At that point in time did you separate them?

{¶ 17} "A. Yes, I did.

{¶ 18} "Q. Okay. And who did you continue to talk to at that point?

{¶ 19} "A. J.N. I took her into my bedroom.

{¶ 20} "Q. All right. So it was just the two of you in there?

{¶ 21} "A. Right.

{¶ 22} "Q. All right. Do you recall what the first question was that you asked her in your bedroom?

{¶ 23} "A. I sat her down and I asked her if she has been in his apartment.

{¶ 24} "Q. Okay. Now, ask you describe for the ladies and gentlemen of the jury what her demeanor was like at that point in time.

{¶ 25} "A. She started crying.

{¶ 26} "Q. All right. If you could, just answer this with a yes or no. Did she say anything at that time?

{¶ 27} "A. Yes, she did.

{¶ 28} "Q. Did—did anything she said to you at that point prompt further questioning by you?

{¶ 29} "A. Yes.

{¶ 30} "Q. Okay. So she may have said something and then you followed up with some questions?

{¶ 31} "A. Yes.

{¶ 32} "Q. How long would you say you talked to J.N. by herself?

{¶ 33} "A. 10, 15 minutes.

{¶ 34} "Q. All right. And can you describe what her demeanor was like during that entire 10 to 15 minutes?

{¶ 35} "A. She was crying hysterically the whole time.

{¶ 36} "Q. Okay. When you say hysterically, was she able to communicate to you?

{¶ 37} "A. Yes.

{¶ 38} "Q. Okay. Had you ever seen her in a state of hysteria like that before?

{¶ 39} "A. No.

{¶ 40} "MR. RASTATTER: Your Honor, can we approach?

{¶ 41} "THE COURT: Yes, you may.

{¶ 42} "* * *

{¶ 43} "(WHEREUPON, a conference was held at the bench between Court and Counsel out of the hearing of the jury but made a part of the record as follows.)

{¶ 44} "MR. RASTATTER: At this point in time what I would like to do is ask the witness what the substance of the victim's statements were to her, and I would argue to the Court that said statements would be admissible under the excited utterance exception to the hearsay rule. I've got a couple cases that I would like to cite, both of which talk about the fact that there's—there's a trend in liberalizing the use of the excited utterance exception when you're talking about out-of-court statements by children who have been victimized by child abuse that typically the amount of time that passes from the incident to the statements, even though there's no set time, that the requirement is whether or not the declarant is still under the stress or excitement of the incident; and there's been a trend to lengthen that with respect to children because the courts have found that children don't really have the mental capacity to reflect on what's happened and that the nervousness and the excitement remains with them longer than it would for an adult. I've got a case that says, you know, that that time period can be days or even weeks.

{¶ 45} "In this particular case we're talking about a number of weeks after the alleged incident. I do have a case that says the Court was not able to determine exactly when the incident happened in relationship to when the statements were made, but they decided that was not the determining factor. What was disposi-tive was the fact that the declarant was a child, was crying, was upset, and was not able to reflect on what happened. So at this point in time I'd ask for permission to ask this witness what the substance of those statements were.

{¶ 46} "THE COURT: Mr. Thomas?

{¶ 47} "MR. THOMAS: Well, Your Honor, I don't know that a foundation's been properly laid that the crying or that even could be laid that she is reacting to the stress of a criminal event as opposed to what has been laid, which is that she'd earlier been told not to go over there at all and that she was now being confronted with the fact that, you know, had you been over there again and she knew—it was just like she was reacting under the stress of having to admit a disobeyance [sic] of her mother. You know, as to any event that might have occurred at that time. I don't know that a foundation's been laid that this is an excited utterance based on, on which event, on the event that you know, that she uttered it happened or if it was that she was admitting or confronted with the fact that she had disobeyed her mother and she was under that influence or feeling.

{¶ 48} "MR. RASTATTER: I think that's a good point. I would ask for maybe a little bit of leeway to go into that with her. Because it's kind of hard to establish a foundation without asking her some questions about what her responses were.

{¶ 49} "THE COURT: All right. I'll give you some leeway. Go ahead.

{¶ 50} "MR. RASTATTER: Okay. Thank you.

{¶ 51} "MR. THOMAS: Thank you, Your Honor.

{¶ 52} "* * *

{¶ 53} "(Continuing in the hearing of the jury.)

{¶ 54} "* * *

{¶ 55} "BY MR. RASTATTER:

{¶ 56} "Q. All right. Mrs. N., we're talking about this conversation you're having with your daughter in your bedroom?

{¶ 57} "A. My bedroom.

{¶ 58} "Q. And you said that the first question you had asked her was had she been to the Defendant's apartment.

{¶ 59} "A. Right.

{¶ 60} "Q. And you had—you had also testified that you had previously told her not to go.

{¶ 61} "A. Right.

{¶ 62} "Q. Did she say she had been to his apartment?

{¶ 63} "A. Yes, she did.

{¶ 64} "Q. Okay. Now, when she said that, is it fair to say that she was admitting to you that she had deliberately disobeyed your order for her not to go there, right?

{¶ 65} "A. Right.

{¶ 66} "Q. Did you say anything to her about that? Did you say—did you begin to tell her or punish her for that or did you say something else to her? What did you say?

{¶ 67} "A. No, I asked her some questions.

{¶ 68} "Q. You asked her more questions?

{¶ 69} "A. Yes, I did.

{¶ 70} "Q. Okay. What were the next series of questions you asked her?

{¶ 71} "A. I asked her if he has ever touched her.

{¶ 72} "MR. THOMAS: Excuse me? I couldn't—I can't hear her.

{¶ 73} "THE WITNESS: I asked her if she has ever touched her.

{¶ 74} "BY MR. RASTATTER:

{¶ 75} "Q. Okay. Now, well, let me start with this. At that point—at this point in time are you asking her questions with an eye toward disciplining her for disobeying you or were you asking her questions to kind of investigate what might have happened?

{¶ 76} "A. To investigate on what might have happened.

{¶ 77} "Q. In any way, did you make it clear to her that that was your primary concern at that point?

{¶ 78} "A. Yes, I did.

{¶ 79} "Q. How so?

{¶ 80} "A. I told her that she needed to tell me the truth about what happened, that no matter what did happen, she was not gonna get in trouble for it.

{¶ 81} "Q. Okay. So I don't know if this is gonna cause you to speculate or not. I just don't know how else to ask the question. But any indication from her that she knew at that point in time that this was not a situation where you were trying to get her in trouble?

{¶ 82} "MR. THOMAS: I'm gonna object, Your Honor. I think that calls for speculation. I mean how is she gonna know what she was thinking, what the daughter was thinking.

{¶ 83} "THE COURT: Unless she made some statement, Counselor, some other means of which she conveyed that idea which had not been set forth, the objection's sustained.

{¶ 84} "BY MR. RASTATTER:

{¶ 85} "Q. Did J.N. ever say anything to you like, 'Are you mad at me for going over there,' or 'Am I in trouble for going over?' Did she say anything like that? Did she try to get some reassurances from you?

{¶ 86} "A. Yes, she did.

{¶ 87} "MR. THOMAS: Objection, leading.

{¶ 88} "THE COURT: Overruled.

{¶ 89} "BY MR. RASTATTER:

{¶ 90} "Q. I'm sorry?

{¶ 91} "A. Yes, she did.

{¶ 92} "Q. And did you reassure her?

{¶ 93} "A. Yes, I did.

{¶ 94} "Q. Okay now, after you reassured her, I think you told her that she wasn't in trouble?

{¶ 95} "A. Right.

{¶ 96} "Q. After you reassured her, was she still crying or did she stop crying at that point?

{¶ 97} "A. No, she was still crying.

{¶ 98} "* * *

{¶ 99} "(WHEREUPON, a conference was held between Counsel, off the record.)

{¶ 100} "* * *

{¶ 101} "(WHEREUPON, a conference was held at the bench between Court and Counsel out of the hearing of the jury but made a part of the record as follows.)

{¶ 102} "THE COURT: Yes.

{¶ 103} "MR. THOMAS: We're at the—I guess he's gonna want to ask the question I objected to earlier on the grounds of lack of foundation. And I still maintain my same objection. I don't know that that's been—I don't know how that that gets us over the hurdle because we still have speculation as to whether or not she believed it to be so or whether—I mean, there's just so many different ways that could be taken, that that just as likely encouraged her to stay on the

path of implicating him. I mean I don't know, I just don't know, Your Honor. I just reaffirm my objection.

{¶ 104} "MR. RASTATTER: Your Honor, the only thing I would like to add is just that, you know, the case law is clear that the trial court has wide discretion in this area and that, again, the main factor is not so much the time that elapsed from the incident, the statements, as it is whether or not the declarant is under the stress and excitement of the incident; and I think it's clear that she was.

{¶ 105} "THE COURT: I'll allow the question.

{¶ 106} "MR. RASTATTER: Thank you.

{¶ 107} "MR. THOMAS: Thank you, Your Honor.

{¶ 108} "* * *

{¶ 109} "(Continuing in the hearing of the jury.)

{¶ 110} "* * *

{¶ 111} "BY MR. RASTATTER:

{¶ 112} "Q. All right, Mrs. N. Can you tell us what it was that J.N. told you happened in response to your question 'Did he ever touch you?'

{¶ 113} "A. She told me yes.

{¶ 114} "Q. All right. Did she give you any details or did you have to ask—

{¶ 115} "A. Yes, she did.

{¶ 116} "Q. Were you asking her more questions or did she just tell you?

{¶ 117} "A. I asked her how he touched her, and she went into detail.

{¶ 118} "Q. What did she tell you?

{¶ 119} "A. She told me that she went up and knocked on his door and he said come in. She bent down on his coffee table to get some candy, that he keeps a bowl of candy there; and when she stood up and turned around, he was standing in front of her, put his hands on her shoulder and squeezed, and said, 'Don't tell anybody but you are a pretty little girl,' ran his hands across her breast area and stuck 'em back up on her shoulders and squeezed again. She tried to jerk away. He squeezed harder. She tried to jerk away and ran out the door."

{¶ 120} In his first assignment of error, Harr contends that the trial court erred in admitting the testimony of Brenda because it was hearsay and not admissible under the excited-utterance exception to the hearsay rule. He also contends that Brenda's hearsay testimony violated his constitutional right to confront J.N., who was his accuser.

{¶ 121} The excited-utterance exception to the hearsay rule provides that a statement is not excluded by the hearsay rule even though the declarant is

available as a witness if the statement relates to a startling event or condition while the declarant was under the stress of excitement caused by the event or condition. Evid.R. 803(2). The exception derives its guaranty of trustworthiness from the fact the declarant is under such a state of emotional shock that his reflective processes have been stilled. Therefore, statements made under these circumstances are not likely to be fabricated. 2 McCormick, Evidence (5th Ed.1999), Section 272.

{¶ 122} It may generally be said that the trial court must focus on the declarant's state of mind at the time the statement was made and that the shock of the event must be present at the time in order for the hearsay exception to apply. McCormick has observed that where a time interval between the event and the statement is long enough to permit reflective thought, the statement will be excluded in the absence of some proof that the declarant did not in fact engage in a reflective thought process. 2 McCormick at 207, Section 272.

{¶ 123} The Supreme Court of Ohio in *Potter v. Baker* (1955), 162 Ohio St. 488, 55 O.O. 389, 124 N.E.2d 140, set forth a four-part test to determine whether or not a statement falls within the excited-utterance exception, holding that the statement may be admissible if the court finds "(a) that there was some occurrence startling enough to produce a nervous excitement in the declarant, which was sufficient to still his reflective faculties and thereby make his statements and declarations the unreflective and sincere expression of his actual impressions and beliefs, and thus render his statement or declaration spontaneous and unreflective, (b) that the statement or declaration, even if not strictly contemporaneous with its exciting cause, was made before there had been time for such nervous excitement to lose a domination over his reflective faculties, so that such domination *continued* to remain sufficient to make his statements and declarations the unreflective and sincere expression of his actual impressions and beliefs, (c) that the statement or declaration related to such startling occurrence or the circumstances of such startling occurrence, and (d) that the declarant had an opportunity to observe personally the matters asserted in his statement or declaration." (Emphasis sic.) Id. at paragraph two of the syllabus.

{¶ 124} The Supreme Court emphasized in *Potter* that flexibility is required in applying the test when the declarant is still under the domination of the exciting event. In *State v. Duncan* (1978), 53 Ohio St.2d 215, 7 O.O.3d 380, 373 N.E.2d 1234, the court addressed the exception in the context of an abused child. In *Duncan*, a six-year-old girl was left at home by her mother. When the defendant stepfather came home, he sexually abused the child. Two hours after the incident, the mother returned home and found the child shaking violently while emerging from a closet. Upon questioning by the mother, the child described the incident. Id. at 218, 7 O.O.3d 380, 373 N.E.2d 1234. The *Duncan* court stated

that when excited utterances by child declarants are offered into evidence, "the strict requirements of the res gestae rule should be relaxed or liberalized." Id. at 220, 7 O.O.3d 380, 373 N.E.2d 1234. The court noted that the child had related the incident at the earliest possible time and there was no indication that the child had "engaged in reflective thought." Id. at 221, 7 O.O.3d 380, 373 N.E.2d 1234.

{¶ 125} In *State v. Wallace* (1988), 37 Ohio St.3d 87, 524 N.E.2d 466, the Ohio Supreme Court held that a child's statements made 15 hours after she was attacked were admissible as excited utterances. Before making the statements, the child had been drifting in and out of consciousness. The court stated, "A period of unconsciousness, even an extended period, does not necessarily destroy the effect of a startling event upon the mind of the declarant for the purpose of satisfying the excited utterance exception to the hearsay rule." Id., at 90, 524 N.E.2d 466.

{¶ 126} In *Wallace,* the Ohio Supreme Court also established guidelines under which declarations made in response to questioning could be admissible as excited utterances. It held that admission is not precluded by questioning that "(1) is neither coercive nor leading, (2) facilitates the declarant's expression of what is already the natural focus of the declarant's thoughts, and (3) does not destroy the domination of the nervous excitement over the declarant's reflective faculties." Id. at 93, 524 N.E.2d 466.

{¶ 127} In *State v. Boston* (1989), 46 Ohio St.3d 108, 545 N.E.2d 1220, the Ohio Supreme Court held that it was not an abuse of discretion for the trial court to admit the statement of a two-and-one-half-year-old child to her mother several hours after the alleged assault occurred. The court determined that considering the surprise of the assault, its shocking nature, and the age of the declarant, it was reasonable for the trial court to determine that the child was still in a state of excitement when the statement was made. Justice Douglas stated:

{¶ 128} "In this case, although time had elapsed between the alleged abusive act and Cynthia's statement to her mother, the mother was the first person in whom the victim confided and this occurred at the earliest opportunity. *There is nothing in the record to indicate that Cynthia had engaged in reflective thought in the intervening time period.* According to the record, Cynthia fell asleep in her mother's car on the return trip to her mother's home. The girl did not awaken until the middle of the night when, according to the mother, the girl awoke crying and screaming. As Deidre took Cynthia to the bathroom and placed her on the toilet, Cynthia continued to cry and was in pain when she tried to urinate. Deidre questioned Cynthia concerning her agitation and Cynthia said: 'Daddy put something up my bucket. * * * [It was] [a] telephone.' Deidre testified that Cynthia cried during this conversation.

{¶ 129} "We find this out-of-court statement testified to by the mother, Deidre, was properly admitted by the trial court pursuant to Evid.R. 803(2)." (Emphasis added.) 46 Ohio St.3d at 118, 545 N.E.2d 1220.

{¶ 130} In *Ohio v. Roberts* (1980), 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597, the United States Supreme Court held that the Sixth Amendment's Confrontation Clause did not bar the admission of an unavailable witness's statement against a criminal defendant if the statement bore "adequate indicia of reliability." To meet that test, the court held that the evidence must either fall within a firmly rooted hearsay exception or bear particularized guaranties of trustworthiness.

{¶ 131} The state focuses in its brief on the recent trend of Ohio courts to rely more on "indicia of reliability" rather than contemporaneousness with the event, when dealing with children. The state cites *State v. Wagner* (1986), 30 Ohio App.3d 261, 30 OBR 458, 508 N.E.2d 164. In *Wagner,* the defendant was convicted of molesting a three-year-old child. The victim's mother testified that her son told her his "bootie" hurt and that the defendant "ate him up." A police investigator testified as to actions the victim demonstrated to her using anatomically correct dolls. The trial court allowed the mother and investigator's testimony based on the excited-utterance exception.

{¶ 132} The Court of Appeals for Cuyahoga County affirmed defendant's convictions. The court rejected appellant's argument that the trial court committed reversible error when it allowed the victim's hearsay into evidence. The court recognized a trend toward expanding the scope of the influence of an exciting event in child-molestation cases because of the unique nature of communications by young victims of sex abuse. In addition, the court said that maximum discretion should be given to the trial court in these cases.

{¶ 133} The court found two requirements for evidence to be allowed under the excited-utterance exception. The first, that the communication be spontaneous, was satisfied because the victim's limited vocabulary prevented him from communicating anything about the event until he was offered the medium of anatomically correct dolls by the police investigator. The second requirement, that the communication be trustworthy, was also fulfilled because the child lacked the reflective powers to comprehend the seriousness of the incident and therefore had no motive to concoct a story.

{¶ 134} The court also determined that the admission of the child's hearsay did not violate the accused's right to confrontation under the Sixth Amendment. Citing *Ohio v. Roberts,* supra, the court emphasized that the Confrontation Clause is satisfied where the hearsay satisfies a firmly rooted hearsay exception. Moreover, the court found the statements to be trustworthy in light of surrounding circumstances.

{¶ 135} Recently, in *Crawford v. Washington* (2004), 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177, the United States Supreme Court held that out-of-court statements that are testimonial are barred, under the Confrontation Clause, unless the witnesses are unavailable and the defendant had a prior opportunity to cross-examine the witnesses, regardless of whether the statements are deemed reliable by the trial court, abrogating *Ohio v. Roberts*. Justice Scalia explained the rationale of the court's opinion:

{¶ 136} "Where testimonial statements are involved, we do not think the Framers meant to leave the Sixth Amendment's protection to the vagaries of the rules of evidence, much less to amorphous notions of 'reliability.' Certainly none of the authorities discussed above acknowledges any general reliability exception to the common-law rule. Admitting statements deemed reliable by a judge is fundamentally at odds with the right of confrontation. To be sure, the Clause's ultimate goal is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee. It commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination. The Clause thus reflects a judgment, not only about the desirability of reliable evidence (a point on which there could be little dissent), but about how reliability can best be determined. Cf. 3 Blackstone, Commentaries, at 373 ('This open examination of witnesses * * * is much more conducive to the clearing up of truth'); M. Hale, History and Analysis of the Common Law of England 258 (1713) (adversarial testing 'beats and bolts out the Truth much better')." 541 U.S. 36, 124 S.Ct. at 1370, 158 L.Ed.2d 177.

{¶ 137} In *State v. Bowles* (April 28, 1998), Franklin App. No. 97APA09–1213, 1998 WL 212868, the Franklin County Court of Appeals held that the trial court abused its discretion in admitting the hearsay testimony of the 12–year–old victim's statements to her grandmother and friend a few days after the alleged sexual abuse. Judge Tyack wrote on behalf of the court:

{¶ 138} "The testimony of both L.K.'s friend and L.K.'s grandmother amounted to blanket recitations of L.K.'s detailed, reflective statements, made to both witnesses by L.K. from days to at least a week after the alleged incident. The record does not support a finding that the statements made by L.K. were the product of the requisite impulse and spontaneity; in fact, some of the statements made by L.K. in the days following the alleged incident were responses elicited by direct questions from the friend and grandmother. As noted by the Supreme Court of Ohio in *State v. Johnson* (1994), 71 Ohio St.3d 332, 338, 643 N.E.2d 1098. ' "A statement naturally becomes more reflective with repetition." ' [Quoting *State v. Justice* (1994), 92 Ohio App.3d 740, 748, 637 N.E.2d 85.]

{¶ 139} "Although both witnesses indicated that L.K. was 'upset,' the record does not support a finding that she was divulging these details in any fashion

other than after deliberation and reflection. As unequivocally stated by the Supreme Court of Ohio in [*State v.*] *Taylor* [ (1993), 66 Ohio St.3d 295] at 303, 612 N.E.2d 316, '[m]erely being "upset" clearly does not meet the standard for admissibility under Evid.R. 803(2) * * *.' Thus, the testimony of these witnesses constituted narrative hearsay accounts beyond the purview of the excited utterance exception."

{¶ 140} The question in this case is whether J.N.'s statements to her mother were testimonial or were excited utterances. Whenever the prosecution offers hearsay evidence in a criminal case, the accused's Sixth Amendment right to confront his accusers is directly implicated. Hearsay exceptions should be narrowly construed by the trial court when the constitutional rights of the accused are directly affected by the admission of the hearsay testimony. We find that the trial court abused its discretion in admitting the hearsay testimony of Brenda. The child's statements to her mother were given nearly two weeks after the startling event and after the child was confronted by her mother for disobeying her order not to enter a stranger's apartment, and only after she interrogated the child with leading questions. A trial court abuses its discretion when it unreasonably applies the law to undisputed facts. *AAAA Enterprises Inc. v. River Place Community Urban Redevelopment Corp.*(1990), 50 Ohio St.3d 157, 553 N.E.2d 597. The trial court abused its discretion in finding that J.N.'s statements to her mother were admissible as excited utterances. The error was not harmless because the hearsay statements were virtually the only evidence presented by the state to support the charge in the indictment. Accordingly, the first assignment of error is sustained. In his second assignment Harr contends the trial court erred in refusing to grant him a mistrial when J.N. began weeping uncontrollably in front of the jury. This assignment has been rendered moot due to our resolution of appellant's first assignment of error.

{¶ 141} In his third assignment, Harr contends that the trial court erred in imposing a greater than minimum sentence upon him as a first offender without first making the required findings. This assignment is also moot for the same reasons.

{¶ 142} In his last assignment, Harr contends that his conviction was against the manifest weight of the evidence and was based on insufficient evidence as a matter of law. Harr's manifest-weight argument has been rendered moot by our resolution of the appellant's first assignment. Because a defendant may not be retried after a judgment has been determined to be based on insufficient evidence, we must consider that argument in the assignment.

{¶ 143} The state was required to prove that Harr had sexual contact with a person less than 13 years old who was not his spouse. See R.C. 2907.05(A)(4).

Sexual contact is defined as any touching of an erogenous zone of another, including the breasts of a female, for the purpose of sexually arousing or gratifying either person. R.C. 2907.01(B). Harr argues that even if he had touched J.N.'s breasts, the state presented no evidence that he did so for the purpose of sexual gratification.

{¶ 144} On review for sufficiency, courts are to assess not whether the state's evidence is to be believed, but whether, if believed, the evidence against the defendant would support a conviction. *Jackson v. Virginia* (1979), 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560. Although close, we believe a jury could infer from Brenda's hearsay testimony that Harr ran his hands across her daughter's breasts for the purpose of sexually gratifying himself. The appellant's last assignment raising insufficiency of evidence is overruled.

{¶ 145} The judgment of the trial court is reversed and the cause is remanded to the trial court for purposes of providing Paul Harr a new trial.

Judgment reversed
and cause remanded.

GRADY and FREDERICK N. YOUNG, JJ., concur.