[Cite as *State v. Oatneal*, 2025-Ohio-2357.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
GREENE COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | C.A. No. 2024-CA-73 |
| Appellee | : | |
| | : | Trial Court Case No. 24 CRB 00917 |
| v. | : | |
| | : | (Criminal Appeal from Municipal Court) |
| JONATHAN M. OATNEAL | : | |
| | : | **FINAL JUDGMENT ENTRY &** |
| Appellant | : | **OPINION** |
| | : | |

. . . . . . . . . . .

Pursuant to the opinion of this court rendered on July 3, 2025, the judgment of the trial court is vacated.

Costs to be paid by the State.

Pursuant to Ohio App.R. 30(A), the clerk of the court of appeals shall immediately serve notice of this judgment upon all parties and make a note in the docket of the service. Additionally, pursuant to App.R. 27, the clerk of the court of appeals shall send a certified copy of this judgment, which constitutes a mandate, to the clerk of the trial court and note the service on the appellate docket.

Tucker, J.; Lewis, J.; and Huffman, J. concur.


For the court,


[[Applied Signature]]

MARY K. HUFFMAN, JUDGE

**OPINION**
GREENE C.A. No. 2024-CA-73

ROBERT ALAN BRENNER, Attorney for Appellant
DANIELLE E. SOLLARS, Attorney for Appellee

HUFFMAN, J.

{¶ 1} Jonathan M. Oatneal appeals from his conviction in the Xenia Municipal Court on one count of domestic violence. For the reasons that follow, the judgment of the municipal court will be vacated.

**Facts and Procedural History**

{¶ 2} On August 17, 2024, Oatneal was cited for domestic violence and assault against his girlfriend, K.F. A bench trial occurred on October 9, 2024. K.F. did not testify at trial; the record reflects that she was initially subpoenaed, but the matter was continued and she was not subpoenaed again. The body camera footage of Xenia Police Officer Hayden Falvey's interview with K.F. about the incident was admitted over objection. Recordings of a 911 call and a non-emergency call to the Xenia police, both of which were made by Oatneal, were also admitted. At the conclusion of the State's case, Oatneal's attorney moved for an acquittal, arguing that her inability to cross-examine K.F. violated the Confrontation Clause. The State responded that K.F.'s statements were admissible as excited utterances. The court overruled the motion for acquittal. The court then dismissed the assault charge but found Oatneal guilty of domestic violence. He was fined, sentenced

to time served, and placed on probation for up to two years.

## Assignments of Error

{¶ 3} Oatneal asserts two assignments of error. He first claims that the trial court violated his right to confront witnesses against him when it admitted Officer Falvey's body camera footage over objection. Oatneal asserts that there was no ongoing emergency when the recording was made. He also asserts that his conviction was supported by insufficient evidence.

{¶ 4} According to Oatneal, K.F. drove to a Dollar General to purchase a Gatorade after the incident and before speaking to Falvey. He notes that the prosecutor withdrew a question to Falvey about K.F.'s statements during the interview in response to Oatneal's objection, and he asserts that there was no other account of the alleged incident beyond the body camera recording. Oatneal claims that K.F.'s responses in the interview were about past events in order to prepare for a criminal prosecution, not about an ongoing emergency.

{¶ 5} The State asserts that K.F.'s statements were non-testimonial and that the right to confront witnesses does not extend to non-testimonial responses to interrogation. The State claims that the statements in the body camera video were admissible hearsay because they fell under the excited utterance exception in Evid.R. 803(2), as K.F. remained under the stress of the incident when she spoke to Falvey. The State argues that an abuse of discretion is not demonstrated, and Oatneal's Sixth Amendment rights were not violated.

{¶ 6} Before addressing the assigned errors, we will review the testimony and evidence presented at trial, including Falvey's body camera footage and the calls made by Oatneal.

{¶ 7} Xenia Police Officer Falvey testified that, at close to 10:00 p.m. on August 17,

2024, he responded to the Dollar General parking lot in the area of East Main Street on a report by Oatneal of domestic violence between him and K.F., who was parked in the lot. Falvey obtained a written statement from K.F., and he took photos of injuries he observed to K.F.'s person. Meanwhile, Oatneal was located near the police department, and Falvey advised officers there to detain him while he completed paperwork. Falvey's body camera recorded his interaction with K.F., which began at 9:54 p.m.

{¶ 8} Sergeant Anthony Vitale of the Xenia Police Division testified that, on August 17, 2024, he was dispatched to an address across the street from the police department on a report of domestic violence. He located Oatneal sitting on a bench, and Oatneal stated that while he was driving away from Shawnee Park with K.F., she had attacked him by slapping him several times in the face. Vitale did not observe any injuries to Oatneal, and he stated that Oatneal's demeanor was calm. Oatneal told Vitale that he had moved out of K.F.'s apartment two weeks earlier.

{¶ 9} Xenia Police Officer Brody Baise testified that he also responded to the domestic violence call. According to Baise, his sergeant asked him to confirm that there was no visible injury to Oatneal, and he did so.

{¶ 10} Falvey's body camera footage depicted Falvey's approach to K.F.'s vehicle in the Dollar General parking lot; he asked if she was K.F. A knot under her left eye and a cut above her left eyebrow were visible in the video, along with dried blood on her left cheek. K.F. stated, "He's never done this," and she identified Oatneal as her assailant. She told Falvey that she and Oatneal had been in her car driving around when he swung at her, and she swung back at him "to keep him off" of her. K.F. stated she eventually climbed into the backseat while Oatneal drove erratically and would not let her out of the car. She told Falvey that Oatneal "went walking up the road over there," pointing from her car to the left.

K.F. appeared very surprised when told that Falvey was there because Oatneal had walked to the police department and reported the incident; she asked why he had done so. K.F. advised Falvey that she intended to just go home and "let it be." She stated that she would never see Oatneal again or go near him.

{¶ 11} When Falvey asked what had happened, K.F. stated that Oatneal had punched her with his fist. Falvey told K.F. that she was not in trouble and asked her to step out of her vehicle. Falvey asked about the time of the incident, whereupon K.F. retrieved a receipt from the car and gave it to Falvey to look at the time of the purchase; she stated that she had purchased the drink five minutes before the incident occurred and then had come straight to the parking lot. K.F. stated, "I'm okay," and "I'm fine."

{¶ 12} K.F. also told Falvey that she and Oatneal had been fishing at Shawnee Park prior to the incident. She denied drinking alcohol, and when Falvey told her that he smelled alcohol, she stated that Oatneal had been drinking and had spilled alcohol in her car. She further stated that she "wasn't even going to call" the police and had intended to just go home. Falvey commented that she had "a pretty big knot" under her left eye. K.F. recounted that, when she and Oatneal left Shawnee Park and were driving around, Oatneal was "yelling and screaming" and called her disrespectful; she told Oatneal to get out of her car, and he poked her in the eyes and slammed on the brakes to cause her to hit her head. K.F. reported that she had swatted at Oatneal, and he said, "You hit me again, I'm going to kill you." When asked about the nature of their relationship, K.F. stated that she and Oatneal had been "boyfriend and girlfriend" for two and a half years. K.F. acknowledged that she "slapped" Oatneal four or five times to get him to stop the car, and she stated that he had punched her four times.

{¶ 13} Sgt. Vitale arrived on the scene while K.F. was writing her statement. When

the officers asked to take her picture, K.F. said she did not want to have her picture taken, "I'm all right now," and "I pulled myself together." One of the officers told her it was necessary to be photographed as part of their investigation of the incident, but K.F. stated that she did not want to pursue it.

{¶ 14} In the recording of Oatneal's 911 call, when asked to state his emergency, Oatneal replied, "Not an emergency. I want to know how to file a restraining order against someone." He denied that the "situation" was "ongoing at the time"; rather, he stated that it was over and he had left. The dispatcher advised Oatneal to call the non-emergency number and provided that number for the Xenia Police.

{¶ 15} Oatneal then called the non-emergency number and stated that K.F. had punched him four or five times while he was driving her car and she was drunk. He reported that the incident had happened an hour earlier on Main Street, past Dollar General, and that he was then across the street from the police department, having walked there from K.F.'s car. Oatneal stated that his right eye was "fine but swollen." He provided K.F.'s name and description. He stated that he had told K.F. to stay at Dollar General, that no weapons had been involved, and he was informed that an officer was being sent to his location.

{¶ 16} Based on this evidence, the trial court overruled Oatneal's motion for acquittal. The court noted that, although Oatneal took issue with the use of the body camera video based on his constitutional right to confront the victim, the evidence on which he relied – the statements he made to the dispatcher and non-emergency number – likewise had not been subject to cross-examination by the State. The court recognized, however, that the constitutional rights of a defendant differ from the rights of the State. The court also noted that Oatneal's statement on the 911 call that his right eye was swollen was contradicted by the testimony of two police officers that there had been no indication that Oatneal had

suffered any injury, much less a swollen eye. As discussed above, the court dismissed the assault charge but found Oatneal guilty of domestic violence.

**Analysis**

{¶ 17} In his first assignment of error, Oatneal argues that his right to confront witnesses against him was violated by the State's use of the body camera video, which set forth K.F.'s version of the events.

{¶ 18} "Although a trial court's hearsay rulings are ordinarily reviewed for abuse of discretion, evidentiary rulings implicating the Confrontation Clause are reviewed de novo." *State v. Curtiss*, 2022-Ohio-146, ¶ 101 (2d Dist.), citing *State v. McKelton*, 2016-Ohio-5735, ¶ 97, citing *United States v. Henderson,* 626 F.3d 326, 333 (6th Cir. 2010.). In de novo review, we independently review a trial court's decision and accord no deference to it. *Id.,* citing *Northeast Ohio Apt. Assn. v. Cuyahoga Cty. Bd. of Commrs.*, 121 Ohio App.3d 188, 192 (8th Dist. 1997).

{¶ 19} "The Sixth Amendment to the United States Constitution provides that '[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him.' " *State v. Wilcox*, 2024-Ohio-5719, ¶ 10. The Confrontation Clause provides two rights to a criminal defendant, namely " 'the right physically to face those who testify against him, and the right to conduct cross-examination.' " *Coy v. Iowa*, 487 U.S. 1012, 1017 (1988), quoting *Pennsylvania v. Ritchie*, 480 U.S. 39, 51 (1987). "Ohio's interpretation of Article I, Section 10 of the Ohio Constitution parallels the federal interpretation, and Ohio's constitution 'provides no greater right of confrontation than the Sixth Amendment.' " *Curtiss,* at ¶ 70, quoting *State v. Self*, 56 Ohio St.3d 73, 79 (1990).

{¶ 20} While " 'hearsay rules and the Confrontation Clause are generally designed to protect similar values, it is quite a different thing to suggest that the overlap is complete and

that the Confrontation Clause is nothing more or less than a codification of the rules of hearsay and their exceptions as they existed historically at common law.' " *State v. Remy*, 2018-Ohio-2857, ¶ 38 (2d Dist.), quoting *California v. Green*, 399 U.S. 149, 155 (1970).

> Our decisions have never established such a congruence; indeed, we have more than once found a violation of confrontation values even though the statements in issue were admitted under an arguably recognized hearsay exception. . . . The converse is equally true: merely because evidence is admitted in violation of a long-established hearsay rule does not lead to the automatic conclusion that confrontation clause rights have been denied.

*Remy*, quoting *Green* at 155-56.

{¶ 21} In *Crawford v. Washington*, 541 U.S. 36 (2004), "the United States Supreme Court explained that the key question for determining whether a Confrontation Clause violation has occurred is whether an out-of-court statement is 'testimonial.' " *Wilcox* at ¶ 10, quoting *Crawford* at 59, 68. "If a statement is testimonial, its admission into evidence will violate the defendant's right to confrontation if the defendant does not have an opportunity to cross-examine the declarant." *Id.*, citing *Crawford* at 53-56. In Crawford's trial for stabbing a man who allegedly tried to rape his wife, the State played the wife's tape-recorded statements to police describing the stabbing. *Id.* at 38. She did not testify at trial, and her recorded testimony was presented to establish that Crawford had not acted in self-defense when he stabbed the victim. *Id.* at 40. The United States Supreme Court held that the statement was testimonial, and thus its admission violated the Confrontation Clause. *Id.* at 68-69.

{¶ 22} While *Crawford* did "not exhaustively defin[e] the term 'testimonial,' other cases . . . added to the definition, and . . . used what came to be called the ' "primary

purpose" ' test." *Remy* at ¶ 53, quoting *Ohio v. Clark*, 576 U.S. 237 (2015).   The "primary purpose of a testimonial statement is to create an out-of-court substitute for trial testimony." *Wilcox* at ¶ 11, citing *Clark* at 245.

Under this test, " '[s]tatements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency.   They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecutions.' "

*Remy* at ¶ 53, quoting *Clark* at 244, quoting *Davis v. Washington*, 547 U.S. 813, 822 (2006).

{¶ 23} "That primary purpose must be measured objectively by the trial court, accounting for the perspectives of the interrogator and the declarant."   *Wilcox* at ¶ 11, citing *Michigan v. Bryant*, 562 U.S. 344, 367-68 (2011).   *Bryant* stressed "that the existence of an ongoing emergency is one of the most important factors in assessing an interrogation's primary purpose, because it focuses participants on something other than proof of past events for purposes of criminal prosecution, and the prospect of fabrication is 'presumably significantly diminished.' "   *State v. Watters*, 2016-Ohio-8083, ¶ 70 (2d Dist.) (Welbaum, J., concurring in judgment), quoting *Bryant* at 361.   "The court likened this to the logic for permitting the 'excited utterance' exception to hearsay."   *Id.,* citing *Bryant.*

{¶ 24} "An emergency may cease to exist if the declarant provides law-enforcement officers with information that indicates the emergency no longer exists or if the perpetrator is disarmed or apprehended."   *Id.*, citing *Bryant* at 365.   For example, "statements made to law-enforcement officers by a victim of domestic violence after the officers had secured the

perpetrator in another part of the home were testimonial, because those statements were neither a cry for help nor the provision of information enabling the officers to immediately end a life threatening situation; rather, they were given to establish events that had occurred previously." *Id.* at ¶ 12, citing *Davis* at 819-820.

{¶ 25} In *Davis,* a domestic violence victim made statements in a 911 call about events "*as they were actually happening"* and not past events. *Davis* at 827. Crawford's wife's interrogation, on the other hand, took place hours after the events she described had occurred. Moreover, it was clear that the victim in *Davis* "was facing an ongoing emergency" and that "the call was plainly a call for help against a bona fide physical threat." *Id.* This was not the case in *Crawford*. Further, the elicited statements in *Davis* were necessary to the resolution of a "present emergency," whereas in *Crawford* they helped the officers learn what had happened in the past. *Id.* There was also a vast difference "in the level of formality between the two interviews," namely that the victim in *Crawford* calmly responded to questions at the station house while the "frantic answers" of the victim in *Davis* were provided over the phone, "in an environment that was not tranquil, or even, (as far as any reasonable 911 operator could make out) safe." *Id.*

An objective analysis of the circumstances of an encounter and the statements and actions of the parties to it provides the most accurate assessment of the "primary purpose of the interrogation." The circumstances in which an encounter occurs – e.g., at or near the scene of the crime versus at a police station, during an ongoing emergency or afterwards – are clearly matters of objective fact. The statements and actions of the parties must also be objectively evaluated. That is, the relevant inquiry is not the subjective or actual purpose of the individuals involved in a particular encounter, but rather

the purpose that reasonable participants would have had, as ascertained from the individual's statements and actions and the circumstances in which the encounter occurred.

(Footnote omitted.) *Bryant,* 562 U.S. at 360.

{¶ 26} Based on our review of the record, we conclude that K.F.'s statements implicated the Confrontation Clause. Oatneal, and not K.F., contacted the Xenia police by walking to the police department from K.F.'s car; he was then detained there, posing no threat, while Officer Falvey spoke to K.F. K.F.'s statements were testimonial because they were made under circumstances that objectively indicated that there was no ongoing emergency. The primary purpose of Falvey's encounter with K.F., as a matter of objective fact, was not to enable Falvey to meet an ongoing emergency.

{¶ 27} Despite K.F.'s visible injuries, the video showed that no emergency existed at that time. According to K.F., the violence had occurred while Oatneal was driving erratically and striking her. K.F. spoke to Falvey while seated in her car, while Oatneal was detained elsewhere. K.F. told Falvey that she intended to go home and "let it be" and had not intended to call the police. She further repeatedly assured the officers that she was okay. In other words, K.F.'s statements indicated that the emergency no longer existed, and she was not seeking help. This conclusion is also supported by Oatneal's statement in the 911 call, before Sgt. Vitale's response to his location, that the incident was over. K.F. did not appear to be at all frantic or panicked in speaking to Falvey. Pursuant to his law enforcement duties, Falvey asked K.F. to write a statement, and the officers advised her that she had to be photographed as part of their inquiry into the incident. In other words, Falvey's actions were purely investigatory.

{¶ 28} Although the Confrontation Clause violation is dispositive of this assignment

error, and further analysis is not required, we note that the State's assertion that K.F.'s statements were admissible as excited utterances is without merit for similar reasons. "Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted in the statement." Evid.R. 801(C). "Hearsay is not admissible unless an exception applies." *State v. Jack*, 2024-Ohio-5594, ¶ 37 (2d Dist.), citing Evid.R. 802. "Pursuant to Evid.R. 803(2), an 'excited utterance' is an admissible form of hearsay." *State v. Blanton*, 2023-Ohio-89, ¶ 74 (2d Dist.). "An excited utterance is '[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition.' " *Id.*, citing Evid.R. 803(2). " 'For a statement to be admissible as an excited utterance, four prerequisites must be satisfied: (1) the occurrence of an event startling enough to produce a nervous excitement in the declarant; (2) a statement made while still under the stress of excitement caused by the event; (3) a statement related to the startling event; and (4) the declarant's personal observation of the startling event.' " *Id.,* quoting *State v. Abner*, 2006-Ohio-4510, ¶ 69 (2d Dist.), citing *State v. Taylor*, 66 Ohio St.3d 295, 300-301 (1993); *State v. Jones,* 2012-Ohio-5677, ¶ 166. " 'The exception derives its guaranty of trustworthiness from the fact that the declarant is under such a state of emotional shock that his reflective processes have been stilted. Therefore, statements made under these circumstances are not likely to be fabricated.' " *Jack* at ¶ 37*,* quoting *State v. Harr*, 2004-Ohio-5771, ¶ 121, citing 2 McCormick, *Evidence*, § 272 (5th Ed. 1999).

{¶ 29} As described above, K.F. was not still under the excitement of the incident with Oatneal when she spoke with the police. Thus, in addition to her statements having been admitted in violation of the Confrontation Clause, K.F.'s statements did not qualify as excited utterances. Because K.F's statements on the body camera video were testimonial in nature

and there was no ongoing emergency, Oatneal's first assignment of error is sustained.

**{¶ 30}** In his second assignment of error, Oatneal argues that the evidence supporting his conviction for domestic violence was insufficient. R.C. 2919.25 proscribes domestic violence and states: "(A) No person shall knowingly cause or attempt to cause physical harm to a family or household member."

**{¶ 31}** As Oatneal points out, the only evidence supporting his domestic violence conviction was contained in Falvey's body camera video. Having determined that the admission of the video violated the Confrontation Clause, we agree with Oatneal that his conviction was supported by insufficient evidence.

**{¶ 32}** For the foregoing reasons, Oatneal's conviction for domestic violence will be vacated.

. . . . . . . . . . . . .


TUCKER, J. and LEWIS, J., concur.